I IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| vs. | : | **CRIMINAL NO. 08-745-1** |
| | : | |
| **JOSE FIGUEROA,** | : | |
|     **Defendant.** | : | |
| | : | |

## MOTION TO SUPPRESS EVIDENCE
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**RUFE, J.**                                   **March 19, 2010**

The Indictment in the above-captioned case charges Defendant Jose Figueroa ("Defendant" or "Figueroa") with conspiracy to distribute cocaine base, possession with intent to distribute cocaine base, and possession of a firearm in furtherance of drug trafficking, as codified in 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 924(c), respectively.[1] Defendant filed the instant Motion to Suppress all physical evidence recovered in connection with his arrests on June 28, 2008 and July 30, 2008 and any statements made by Defendant.[2] Upon consideration of Defendant's Motion, the Government's Response,[3] and an evidentiary hearing and oral argument held thereon,[4] the Court enters the following findings of fact and conclusions of law.

---

[1] Doc. No. 1. These offenses are

[2] Doc. No. 145. At the suppression hearing, Defendant withdrew his Motion as it pertains to any statements. See Transcript of the suppression hearing held on March 11, 2010 ("Tr.") at 2:12-21.

[3] Doc. No. 154.

[4] See Doc. No. 158.

## I. FINDINGS OF FACT

1. Prior to June 28, 2008, Vice Detective Randy Fey ("Fey"), along with his law enforcement colleagues, were investigating allegations of criminal activities of the Latin King gang in the city of Allentown, Pennsylvania.[5] Fey was informed that Figueroa, a/k/a King Vega, was a member of the Latin Kings who was involved in drug dealing.[6]

2. On June 28, 2008, Fey received information from a reliable confidential informant that Figueroa, Thomas Chrin ("Chrin"), and Raul Clements ("Clements") were making deliveries and picking up drugs in Allentown.[7] The informant told law enforcement that the three men would be using a black Subaru[8] and would be stopping at a location in the 100 block of South Blank Street.[9]

3. Fey found the black Subaru at the address given to him by the informant sometime after nightfall on June 28th, between the approximate hours of 7 p.m. and 9 p.m.[10] He observed three individuals, whom he recognized as Figueroa, Chrin, and Clements,[11] exiting the Subaru and entering the South Blank Street location.[12] They stayed inside for 20 to 30

---

[5] Tr. at 9:19-25, 10:1-7.

[6] Id. at 10:2-25, 11:1-7.

[7] Id. at 11:8-16, 13:1-8.

[8] Id. at 13:9-12.

[9] Id. at 13:13-16.

[10] Id. at 13:17-21.

[11] Id. at 14:1-7.

[12] Id. at 14:1-3.

minutes.[13] Fey (driving an unmarked car[14]) called for additional units.[15]

4. The three suspects left the Blank Street location, reentered the black Subaru, and drove away from the Blank Street address.[16] Fey and other law enforcement vehicles were unable to follow them, as they drove evasively through alleyways in an attempt to evade surveillance.[17]

5. Knowing that Figueroa lived on 14th Street, Fey and the other officers drove to that location, where they again observed the black Subaru.[18] Fey estimates that five to ten minutes passed between losing sight of the Subaru and encountering it again at Figueroa's residence.[19]

6. The Subaru pulled into the parking lot across the street from Figueroa's house.[20] Figueroa exited the car and ran inside.[21]

8. Figueroa returned to the car, and the three men drove off at approximately 40 to 50 miles per hour down an alleyway, exceeding the posted speed limit of 25 miles per hour.[22]

9. Fey called for the marked police units to make a vehicle stop of the Subaru.[23] Despite

---

[13] Id. at 14:8-12.

[14] Id. at 15:8-9.

[15] Id. at 14:11-18.

[16] Id. at 14:19-25, 15:1-2.

[17] Id. at 15:1-23.

[18] Id. at 15:3-5.

[19] Id. at 16:10-15.

[20] Id. at 16:20-23.

[21] Id. at 16:24-25, 17:1.

[22] Id. at 17:12-25, 18:1-3.

[23] Id. at 18:4-7.

evasive driving, the units were able to make the stop on Turner Street.[24]

10. Fey pulled his unmarked car 40 to 50 feet behind the Subaru and the marked units; he wanted to keep his distance to maintain his cover.[25] The officers approached the driver and asked for license and registration information, as well as identification from each passenger of the car.[26] Fey received a radio transmission that Figueroa had provided two ID cards with separate identities.[27]

11. Fey watched the officers remove Figueroa from the vehicle and pat him down, discovering a large bag of marijuana on his person.[28] The officers then handcuffed Figueroa's hands behind his back and placed him in the back of a patrol unit.[29]

12. Sitting in the back of the patrol unit, Figueroa pulled a large plastic bag of cocaine from his pants (which had been hidden somewhere in the vicinity of his anal cavity) and attempted to eat it.[30] Seeing the commotion, officers at the scene tried to pull Figueroa out of the cruiser and a struggle ensued, creating a dust cloud of cocaine.[31] When Fey noticed the struggle, he decided to get involved in the traffic stop.[32]

---

[24] Id. at 18:14-25, 19:1-15.

[25] Id. at 19:16-23, 21:5-9.

[26] Id. at 20:1-5.

[27] Id. at 20:7-12.

[28] Id. at 20:13-18.

[29] Id. at 20:19-22.

[30] Id. at 21:17-25.

[31] Id. at 21:13-17.

[32] Id. at 21:5-13.

13. Police ripped the bag out of Figueroa's mouth, but he had already eaten most of the cocaine.[33] Figueroa became sweaty, being affected by the drugs, and police later took him to the hospital for treatment.[34] At the hospital, an additional large bag of marijuana was found next to his bed.[35]

14. Fey obtained written consent from Chrin, the driver of the Subaru, to search the car.[36] The resulting search uncovered 1) a cigarette packet with a dollar bill or some form of paper currency, containing powder cocaine, in the middle console, and 2) crack pipes or glass pipes in plain view on the driver's side door shelf.[37]

15. Both Chrin and Figueroa were arrested and charged with illegal possession of the controlled substances recovered on June 28, 2008[38] and taken into custody.

16. As stated on the record at Figueroa's suppression hearing, and without objection by either party, the Court incorporates its Findings of Fact from Co-Defendant Adammychal Fletcher's suppression hearing and the corresponding Memorandum Opinion.[39] These facts, in large part, pertain to a subsequent traffic stop on July 30, 2008.

---

[33] Id. at 22:1-13.

[34] Id. at 22:12-16.

[35] Id. at 22:17-21.

[36] Id. at 23:5-10.

[37] Id. at 23:9-19.

[38] Id. at 23:20-22, 25:18-21.

[39] Id. at 6:1-11. See United States v. Jose Figueroa, et al., No. 08-745 (E.D. Pa. March 18, 2010) (order denying Defendant Fletcher's Motion to Suppress).

## II.  DISCUSSION OF APPLICABLE LAW

Figueroa asserts various theories in support of his motion to suppress the evidence gathered as a result of the June 28, 2008 and July 30, 2008 arrests.  First, he alleges Fourth Amendment violations in both traffic stops, based on a lack of reasonable suspicion to believe that a crime or crimes had been committed.  Specifically, Figueroa cites a lack of evidence regarding the confidential informant's veracity, reliability, and basis of knowledge.  Second, Figueroa challenges whether there was a requisite level of cause for his pat-downs and subsequent arrests on both dates.[40]  The burden is on the Government to prove by a preponderance of the evidence that any warrantless search or seizure that occurred was lawful,[41] and that any consent given to search was voluntary.[42]

A. *June 28, 2008 stop, frisk, and arrest*

Figueroa claims that the allegedly unlawful vehicle stops led directly to the discovery of the evidence at issue, and because it was obtained as a direct result of unlawful seizures, the Court should suppress the evidence found by law enforcement as a result of the June 28, 2008 and July 30, 2008 arrests.  The first stop, on June 28th, was based on information gathered in the ongoing investigation of the Latin Kings, combined with a tip received from a confidential informant and corroborated by the specific observations of Fey on that date.  To evaluate whether the requisite level of reasonable suspicion was achieved by the information available to law enforcement, the Court looks to the Fourth Amendment of the Constitution.

---

[40] Defendant's Motion also questions whether the consent Figueroa gave to search his mother's house was valid.  However, this argument appears to be related to the suppression of statements by Defendant, a Motion withdrawn by defense counsel.  Moreover, neither party addressed this issue and Defendant did not argue it at the suppression hearing.  Thus, the Court finds that the issue is abandoned.

[41] See United States v. Morales, 861 F. 2d 396, 399 (3d Cir. 1988).

[42] See United States v. Matlock, 415 U.S. 164, 177-78, n.14 (1974).

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures."[43] Significantly, the warrant requirement acts as protection against Fourth Amendment violations by law enforcement. At issue in the present matter is one of the exceptions to the warrant requirement in which "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot" ("Terry stop").[44] The level of suspicion required by Terry is less than the probable cause standard and need not be supported by a preponderance of the evidence,[45] but the officer must have a "'particularized and objective basis' for suspecting legal wrongdoing"[46] and it must be more than a mere "hunch."[47] Law enforcement expertise and training can be a factor in the analysis.[48] A court evaluates the objective basis for a stop in light of the totality of the circumstances surrounding it.[49]

The Court begins its Terry analysis by evaluating the information provided by a confidential informant that led to the surveillance and eventual traffic stop. Where the primary basis for a Terry stop is an informant's report or "tip", a Court must look to the 'veracity,' 'reliability,' and

---

[43] U.S. Const. amend. IV.

[44] Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

[45] Id.

[46] United States v. Arvizu, 534 U.S. 266, 273 (2002) (referencing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

[47] Terry v. Ohio, 392 U.S. 1, 27 (1968).

[48] Supra, note 46.

[49] United States v. Nelson, 284 F.3d 472, 477-78 (3d Cir. 2002); Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).

'basis of knowledge' of that individual.[50] The Third Circuit, reviewing multiple cases involving tips received in a variety of different circumstances, has established generally that:

> [t]he following specific aspects of tips indicate reliability:
>
> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
>
> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.
>
> (3) The content of the tip is not information that would be available to any observer. A not truly anonymous tip is accorded greater weight when the specific details of language, type of activity and location matched a pattern of criminal activity known to the police, but not the general public, and the tip could not have been generated by the general public, nor based solely on observation.
>
> (4) The person providing the information has recently witnessed the alleged criminal activity.
>
> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility. Predictive information is also useful in that it can reflect particularized knowledge.[51]

In the instant matter, the police received information regarding the alleged activities of Figueroa and Chrin through a tip from a confidential informant, an informant that Fey reasonably believed to be reliable, knowledgeable, and honest. Fey had worked with the same informant for approximately six months prior to June 28th, specifically concerning the Latin Kings investigation. He had received reliable, corroborated tips in the past from the same informant, as well as used the informant's help with controlled buys.

---

[50]Illinois v. Gates, 462 U.S. 213, 230 (1983).

[51]United States v. Brown, 448 F.3d 239, 249-50 (3d Cir. 2006) (citations omitted).

The confidence that Fey had in the informant's tip was then bolstered by substantial corroborating evidence on June 28th. Fey found Figueroa, Chrin, and Clements stopped at a location on the 100 block of South Blank Street, exiting a black Subaru; this was precisely as the confidential informant had described. Fey observed the three suspects enter and exit the Blank Street location, and then followed them as they drove evasively in an attempt to avoid law enforcement surveillance or capture. These factors, taken together, provide ample evidence to support, at the very least, a reasonable belief that the three suspects were in fact involved in criminal activity.[52]

Considering the foregoing factors as applicable to this case, the Court agrees with the Government that the information gathered from the ongoing Latin Kings investigation, including specific knowledge from police sources regarding Figueroa's involvement, combined with the confidential informant's tip and the corresponding corroborative evidence, supplied Fey and the other officers with a proper basis for the initial Terry stop. Accordingly, the Court concludes that the initial stop in question was lawful because it was supported by reasonable suspicion.

Next, Figueroa challenges the basis for his frisk and arrest on June 28th. A search is unreasonable if it is conducted without adequate justification; depending on the circumstances and the scope of the search, either reasonable suspicion or probable cause is required. Figueroa asserts that the proper level of justification did not exist for the search of his person conducted by law enforcement during the traffic stop.

The Fourth Amendment represents a balance between an individual's right to personal security and the public interest. Reasonable searches and seizures are situations in which courts have

---

[52]Officer observations of multiple driving violations, standing alone, would permit a stop of the vehicle; however, given the evidence presented, this Court does not find that to be the primary reason for the stop.

decided that balance favors some limited invasion of personal security. The Supreme Court in Terry, and then Mimms (which applied Terry to the traffic stop context) made such a determination when it stated that officer safety can excuse pat-down searches if the officer has reason to believe that the individual is armed and dangerous.[53] It is an objective standard: the action must be reasonable to the particular officer given the relevant facts.[54] If law enforcement has probable cause to search an individual, the search need not be limited to a pat-down for officer safety.

In this matter, the specific information related to Figueroa concerned allegations of the delivery and pick-up of illegal drugs; the corroborated tip and the subsequent attempts of the three suspects to evade surveillance provided substantial evidence for law enforcement. Furthermore, when the police approached Figueroa and asked for identification, he provided two IDs with two separate identities. As such, the level of suspicion had risen to probable cause, meaning that "the facts and circumstances within [officers'] knowledge and of which [officers] had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief" that evidence of illegality could be found on the occupants of the vehicle.[55] During this search, the officer conducting the pat-down felt a large bag of marijuana on Figueroa's person, and removed it. This was not constitutionally problematic, because the officer had probable cause to search for evidence of illegal activity, not only weapons. The Court concludes that police had probable cause to search Figueroa after the traffic stop on June 28, 2008.

---

[53] See supra, note 47; Pennsylvania v. Mimms, 434 U.S. 106 (1977). Officers, by the same reasoning, can ask an occupant of a vehicle to get out of the car during a traffic stop. Mimms, at 111.

[54] Supra, note 47, at 21-22.

[55] Carroll v. United States, 267 U.S. 132, 162 (1925).

B. *July 30, 2008 stop, frisk, and arrest*

Figueroa challenges the basis for the July 30, 2008 traffic stop, as well as the subsequent pat-down and arrest as it pertains to him. As the Court has already ruled on the basis for the July 30, 2008 traffic stop,[56] we need only consider the pat-down and arrest.

On the date in question, Figueroa visited a residence at 965 Tilghman, a location known to be a site for cooking crack cocaine. Fey received specific information from a police source, in fact, that Figueroa and Chrin were using the 965 Tilghman location for that purpose. Figueroa appeared there with Chrin and Fletcher, the latter of whom was observed conducting what Fey reasonably believed to be hand-to-hand drug sales. When the three suspects left 965 Tilghman in the black Subaru, Fey witnessed the same type of evasive driving that he had seen on June 28th. The marked police units made a traffic stop, and Fey observed Fletcher's suspicious behavior in the backseat and white powder covering the interior of the vehicle. In addition, there was an outstanding bench warrant for Chrin's arrest. Considering all of this evidence, Fey and his fellow officers had more than a reasonable belief that the three suspects were involved in illegal drug activity as suggested by police sources.

During the pat-down of Figueroa, the officer found at least one pill on his person that was later identified as ecstasy, a controlled substance. This discovery of illegal contraband was clearly enough to justify his immediate arrest. Thus, the Court finds that law enforcement conducted itself properly under the Fourth Amendment, and Figueroa's Motion must be denied.

---

[56]United States v. Jose Figueroa, et al., No. 08-745 (E.D. Pa. March 18, 2010) (order denying Defendant Fletcher's Motion to Suppress).

## III. CONCLUSIONS OF LAW

*Conclusions related to the June 28, 2008 traffic stop:*

1. Based on information and observations, law enforcement had reasonable suspicion to make the traffic stop of the black Subaru. A frisk was authorized.

2. Pursuant to the discovery of two IDs and the pat-down of Defendant, in which a large bag of marijuana was discovered on his person, law enforcement had probable cause to arrest.

*Conclusions related to the July 30, 2008 traffic stop:*

3. Based on prior contact with Defendant and his arrest on June 28th for drug-related activities, and in consideration of additional information from reliable sources, together with his own observations of illegal drug sales at 965 Tilghman Street, Vice Detective Fey and other law enforcement officers had a reasonable, articulable suspicion that criminal activity was afoot, and therefore the stop of the vehicle was permissible under the Fourth Amendment.

4. Due to substantial evidence of illegal drug activity, including observations of hand-to-hand drug sales, visible white powder throughout the car, and suspicious activity in the backseat, law enforcement had probable cause to search all passengers for illegal contraband.

5. Once an ecstasy pill was discovered on Defendant's person, and taking into account his actions in attempting to destroy evidence on June 28, 2008, police had probable cause to arrest Defendant.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Physical Evidence and Statements is **DENIED**. An appropriate Order follows.