**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————
                                                    :
**UNITED STATES OF AMERICA**          :
                                                    :
      **vs.**                                   :      **CRIMINAL NOS: 08-000745-01**
                                                    :                              **08-000745-02**
**JOSE IVAN FIGUEROA**               :                              **08-000745-03**
**a/k/a "King Vega";**                 :
                                                    :
**THOMAS STACY CHRIN; and**          :
                                                    :
**ADAMMYCHAL S. FLETCHER,**          :
                                                    :
            **Defendants.**                 :
———————————————————————:

**MEMORANDUM ORDER AND OPINION**

**Rufe, J.**                                                          **July 14, 2011**

On December 16, 2008, a grand jury sitting in the Eastern District of Pennsylvania issued

an indictment alleging a cocaine-base ("crack") distribution conspiracy, which included among

its members Jose Figueroa, Thomas Chrin, Adammychal Fletcher, Samuel Hartung, and Chelsy

Blount.[1]  The indictment charged all Defendants with conspiracy to distribute 5 grams or more of

cocaine base in violation of 21 U.S.C. § 846, possession with intent to distribute cocaine base in

violation of 21 U.S.C. §841(a)(1), and possession of a firearm in furtherance of drug trafficking

in violation of 18 U.S.C. §924(c).  Chrin was charged with an additional count of possession of a

firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  The indictment charged that,

in total, the conspiracy possessed 8.09 grams of crack and 5.46 grams of powder cocaine with the

intent to distribute.

———————————————

[1] Doc. No. 1.

1

# I. Introduction

Each Defendant—albeit at different stages in the prosecution—entered guilty pleas to the charged offenses.[2]  Three of those Defendants—Jose Figueroa, Thomas Chrin, and Adammychal Fletcher—have not yet been sentenced.  Prior to imposing their sentences, the Court must resolve three issues.

The first question is whether the Court may sentence Defendants based on the drug quantities they admitted to during their plea allocution when lesser quantities were charged in the indictment.  The charged quantities expose them to a sentence of 5 to 40 years imprisonment; the admitted quantities expose them to 10 years to life.  Our decision is controlled by Apprendi v. New Jersey[3] and United States v. Cotton,[4] which require that a sentencing factor deemed an element under Apprendi must be charged in the indictment and submitted to the jury.  Though it is well established that a defendant's plea allocution waives the requirement of submitting the quantity question to the jury, the question of whether a plea allocution admission as to quantity also waives the indictment requirement is an issue of first impression.

The second issue involves the applicability of the Fair Sentencing Act ("FSA").[5]  Because this Court concludes, as explained below, that a defendant's admission of a quantity in a plea

---

[2] See Doc. Nos. 112 (Hartung Change-of-Plea Hearing); 113 (Blount Change-of-Plea Hearing); 165 (Chrin Change-of-Plea Hearing).

[3] 530 U.S. 466 (2000).

[4] 535 U.S. 625 (2002).

[5] Fair Sentencing Act of 2010, Pub. L. No. 89-110, § 2(a)(2), 124 Stat. 2372, 2372 (August 3, 2010) (codified at 21 U.S.C. §§ 841(b)(1) et seq.).  As explained below, had the Court accepted the Government's argument that the amount of drugs established by the preponderance of the evidence controlled Defendants' statutory sentence, the FSA would not impact their statutory punishment because the sentence triggered by that amount of drugs is unchanged regardless of the applicability of the FSA.

allocution does not waive the required elements of an indictment, and that Defendants' statutory sentences are controlled by the quantities alleged therein, the applicability of the FSA to these Defendants' sentences is at issue.  Under pre-FSA statutory sentencing requirements, the amount of cocaine and crack cocaine alleged in the indictment exposed the Defendants to a statutory minimum sentence of five years and a maximum sentence of forty years.  Post-FSA, the same drug quantity triggers a statutory maximum sentence of twenty years, and no mandatory minimum.  The FSA was enacted on August 3, 2010; the Defendants pled guilty on March 24, 2010, and the charged conduct occurred in the summer of 2008.  Although Defendants concede that the charged conduct occurred prior to the FSA's enactment, and that the Act contains no express statement of retroactivity, they contend that the more lenient provisions of the FSA apply.  The Government maintains that under the general savings statue, 1 U.S.C. § 109, the Court must apply the penalties in place at the time the crime was committed.  Because multiple cases dispositive to this issue are pending before the Third Circuit the Court has reserved judgment on the applicability of the FSA until the time of Defendants' sentencing.

Third, notwithstanding the applicability of the FSA, the Court must determine the amount of drugs attributable to each defendant under the United States Sentencing Guidelines.  In order to do so, the Court must make an individualized determination, based on the preponderance of the evidence, of the drug quantity foreseeable to each defendant who participated in this drug conspiracy.  We turn now to the tasks at hand.

## II.  PROCEDURAL BACKGROUND

Although Hartung, Chrin and Blount pled guilty and entered into plea agreements with

the Government relatively early in the prosecution,  Figueroa and Fletcher proceeded to trial in March 2010.  On the third day of trial—after five law enforcement officers testified and after Chrin had testified extensively on direct examination about the operation of the conspiracy[6]—Figueroa and Fletcher each entered an open plea of guilty (i.e., a plea without a plea agreement) to Counts One, Two, and Three of the Indictment in separate change-of-plea hearings.[7]

At the separate hearings, the Court asked the Government to explain to each defendant the statutory minimums and maximums that they faced as a result of the guilty plea.[8]  For Counts One and Two, which charged the Defendants with conspiracy to distribute five grams or more of cocaine base, and respectively, possession with the intent to distribute, each defendant faced a minimum of five years and a maximum of forty years incarceration.[9]  For the firearm offense, each defendant faced a mandatory consecutive minimum sentence of five years and a maximum sentence of life imprisonment.

After the Court explained the statutory maximums and minimums, it informed both Defendants that the testimony taken in both pretrial hearings, the suppression hearing, and the trial testimony formed the factual basis for their guilty pleas.[10]  Next, the Government summarized the evidence it would have presented against the Defendants had the case gone to

---

[6] Defendants entered their guilty pleas prior to their opportunity to cross-examine Chrin.

[7] See Doc. Nos. 180 (Fletcher Change-of-Plea Hearing) ("Fletcher Hr'g"); 181 (Figueroa Change-of-Plea Hearing) ("Figueroa Hr'g").

[8] Figueroa Hr'g Tr. 29:8–31:4; Fletcher Hr'g Tr. 27:8–28:11.

[9] Id.

[10] Figueroa Hr'g Tr. 38:19–25; Fletcher Hr'g Tr. 29:16–21.

trial.  In her recitation of facts, the prosecutor specifically noted that over the course of the conspiracy, Chrin sold 336 grams of crack cocaine for Fletcher, and that Figueroa personally sold 168 grams of crack.[11]  At the end of the recitation, both Defendants agreed that the Government had accurately summarized the facts of his case, and admitted to committing all acts which the Government had recited to the Court.[12]

In preparation for sentencing, the Probation Office developed a Presentence Investigation Report (PSIR) for each defendant.[13]  Each PSIR calculated recommended guideline sentences and statutory minimums based on the drug quantity alleged in the indictment—8.09 grams.  At that time, 21 U.S.C § 841(a)(1) and (b)(1)(B)(iii) provided that any person who distributed five grams or more of a substance containing cocaine base was subject to a minimum term of five years imprisonment.  In addition to the five-year minimum triggered by the drug quantity charged in the indictment, each Defendant was also subject to a consecutive five-year sentence for the firearms offenses under 18 U.S.C. § 924(c).[14]  The Government did not timely object to any defendant's PSIR.

---

[11] Figueroa Hr'g Tr. 38:2–7; 39:5–6 (admitting that Chrin cooked an ounce (twenty-eight grams) every week); Fletcher Hr'g Tr. 31:20–23; 32:2–5 ("Mr. Chrin testified that the defendant, Mr. Fletcher, sold approximately fourteen grams of crack cocaine every week for the period of May, June, and July of 2008.").

[12] Figueroa Hr'g Tr. 39:6–12; Fletcher Hr'g Tr. 32:1–10.

[13] Hartung's PSIR was prepared on June 3, 2010, and revised on June 28, 2010.  Blount's PSIR was prepared on June 16, 2010 and revised on July 1, 2010.  Chrin's PSIR was prepared on May 18, 2010, and revised on June 28, 2010 and February 8, 2010.  Fletcher's PSIR was prepared on June 11, 2010 and revised on June 29, 2010 and April 27, 2011.  Figueroa's PSIR was prepared on June 10, 2010 and revised on December 10, 2010 and April 27, 2011.

[14] At the time that Hartung and Blount were sentenced, 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii) provided that any person who distributed five grams or more of a substance containing cocaine base was subject to a mandatory minimum of five years imprisonment.

On August 3, 2010, before Chrin, Fletcher, and Figueroa were sentenced, Congress passed the FSA, which raised the threshold to trigger the five- to forty- year sentencing range from five grams to twenty-eight grams.[15]  For amounts under twenty-eight grams, the maximum sentence is now twenty years; no mandatory minimum applies.  Under the FSA, on November 1, 2010, the Sentencing Commission issued temporary emergency amendments to §§ 2D1.1 and 2D2.2 of the Guidelines to reflect the FSA's requirements.[16]  The amendments substantially altered the calculation of drug quantities and Guideline ranges for drug offenses.[17]

Soon after the Sentencing Commission issued the emergency amendments, Figueroa's attorney sought a continuance for Figueroa's sentencing hearing (originally scheduled for December 1, 2010), noting that, because of the "significant changes in federal law with regard to mandatory minimum sentencing," she required additional time to prepare Figueroa's sentencing strategy.[18]  Fletcher's attorney also sought a continuance,[19] and submitted a letter-sentencing memorandum contending that because the FSA applied to this case, the Court's sentencing

---

[15] See FSA at § 2(a)(2) (codified at 21 U.S.C. §§ 841(b)(1)(B)(iii)).  Prior to the Act's passage, the sentencing provision applicable to the drug offenses alleged here equated 1 gram of crack cocaine or cocaine base with 100 grams of powder base.  The 100-to-1 ratio, which was enacted in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986), reflected the belief that "cocaine base [was] more dangerous to society than [powder] cocaine because of crack's potency, its highly addictive nature, its affordability, and its increasing prevalence."  United States v. Santana, 761 F. Supp. 2d 131, 135 (S.D.N.Y. 2011) (quoting United States v. Buckner, 894 F.2d 975, 978 (8th Cir. 1990)).

[16] See Notice of Temporary, Emergency Am. to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66,188, (Oct. 27, 2010).

[17] Specifically, the Drug Equivalency Tables in Application Note 10 of the Amended Sentencing Guidelines change the crack cocaine equivalency from one gram of crack equaling twenty kilograms of marijuana to one gram of crack equaling 3,751 grams of marijuana.

[18] Def's. Unopposed Mot. to Continue Sent. [Doc. No. 229].

[19] Consent Mot. for Continuation of Sent. Hr'g [Doc. No. 233].

discretion was not limited by the five-year mandatory minimum regarding the drug offense.[20]

The Government responded to the Defendants' argument regarding the applicability of the FSA in its December 8, 2010 Sentencing Memoranda for Figueroa.  There, the Government argued that the applicability of the FSA is irrelevant, because the quantity of drugs actually sold by the conspiracy and attributable to each defendant greatly exceeded the amount charged in the indictment.[21]  In the Government's view, the preponderance of the evidence showed that the aggregate sum sold by the conspiracy totaled 336 grams, triggering a sentencing range of ten years to life, regardless of whether the FSA applied.  Although the Government had not objected to Figueroa's PSIR (which had been drafted and circulated almost six months earlier), it contended that the PSIR failed to properly account for the trial testimony of Chrin, which showed that Figueroa sold at least 336 grams of crack cocaine during the conspiracy.[22]

In order to resolve common issues to all Defendants, on December 14, 2010 the Court issued an order directing all Parties to submit additional briefing as to, among other things, whether the evidence established that the conspiracy involved a quantity of crack cocaine unaffected by the changed mandatory minimum thresholds of the FSA.[23]

Counsel for Fletcher and Figueroa submitted briefs, both reiterating their arguments that

---

[20] See Fletcher Letter Sent. Mem. at 2 (conceding the applicability of the five-year mandatory minimum for the weapon offense).

[21] Gov't's Sent. Mem. at 8 (Figueroa) ("First Gov't Sent. Mem.").

[22] First Gov't Sent. Mem. at 7.

[23] Doc. No. 242.

the FSA dictates the appropriate sentence for their clients.[24]  Neither brief advocated for a specific drug quantity attributable to either Defendant; instead, to the extent that relevant conduct was addressed, Defendants argued that the consideration of relevant conduct "flies in the face of the [Sentencing] Act's purpose."[25]

The Government submitted a Memorandum of Law as to Sentencing for Figueroa, Fletcher, and Chrin.[26]  There, the Government renewed its contention that the FSA does not apply in the calculation of the appropriate sentencing range, and that even if it did, the Defendants were exposed to the same sentencing range regardless of the applicability of the FSA.[27]  Notably, the Government argued that the attributable quantity to the conspiracy—and to each defendant—was 936 grams, a 600 gram increase from the amount calculated in the Government's  December Sentencing Memorandum for Figueroa.[28]  The increase in the Government's calculation resulted from its inclusion of the amounts sold by Hartung during the conspiracy.[29]

On April 27, 2011, the probation office issued revised PSIRs for both Figueroa and Fletcher.  The reports adopted the Government's position regarding drug quantities, and recommended that the court attribute 936 grams of crack and 134 grams of powder cocaine to

---

[24] Fletcher Supplemental Sent. Mem. [Doc. No. 243]; Figueroa Mem. Regarding Relevant Conduct under USSG Section 1B1.3 & the Fair Sentencing Act of 2010 [Doc. No. 244].

[25] Mem. of Law Regarding Relevant Conduct under U.S.S.G. § 1B1.3 and the Fair Sentencing Act of 2010 at 5 [Doc. No. 244].

[26] Doc. No. 252.

[27] Gov't Mem. of Law as to Sent. at 19 (Figueroa, Fletcher, Chrin) ("Second Gov't Sent. Mem.").

[28] Second Gov't Sent. Mem. at 19.

[29] Second Gov't Sent. Mem. at 23.

Figueroa and Fletcher.

## II. ANALYSIS

### A. THE STATUTORY SCHEME

Title 21 U.S.C. § 841(a) makes it "unlawful for any person knowingly or intentionally (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," such as crack cocaine and powder cocaine.[30]  Any person who engages in conduct proscribed by § 841(a)(1), or who conspires to do so, is subject to penalties detailed in the lettered subsections of § 841(b)(1), which provide a staircase of mandatory minimum and maximum sentences for drug crimes depending on the nature and quantity of the drugs in the case.  In the case of crack cocaine, there are three tiers of penalties.[31]

Under pre-FSA law, in cases involving "50 grams or more" of crack, § 841(b)(1)(A) imposed "a mandatory ten-year minimum to lifetime maximum for any offense in the prescribed quantity."  Post-FSA, the threshold to trigger the ten-year minimum has been raised to 280 grams, but the penalties remain the same.  Similarly, pre-FSA cases involving "5 grams or more" of crack prescribed a "mandatory five-year minimum to forty-year maximum;" post-FSA, the threshold to trigger the five-year minimum has been raised to 28 grams.  In cases involving lesser or unquantified amounts of crack, § 841(b)(1)(C) prescribes a "zero minimum to twenty-year

---

[30] See also 21 U.S.C. § 812 (identifying coca-leaf derivatives as controlled substances pursuant to Schedule II(a)(4)).

[31] The three subsections also detail sentence enhancements associated with prior felony convictions, death or serious bodily injury, and the combination of those two factors.  Because those enhancements are not applicable here, we discuss only the baseline sentencing ranges for each drug-quantity category.  See also United States v. Sanchez-Gonzalez, 294 F.3d 563, 565 (3d Cir. 2002).

maximum" for any offense.  Whereas prior to the FSA, a case involving less than 5 grams would fall into the §841(b)(1)(C) "catch-all," now cases involving 28 grams or less fall into that category.

B.    DRUG QUANTITIES

The court must determine which drug quantity determines the defendant's statutory sentencing range.  There are three options: 1) the amount of drugs (more than 5 grams) charged in the indictment; 2) the drug quantities Defendants admitted to distributing or possessing with the intent to distribute in their plea allocution; or 3) the amount of drugs—936 grams—that the Government argues is attributable to the charged conspiracy.  The Government has argued—and the defense conceded—that the amount of drugs triggering the mandatory minimums should be determined by the preponderance of the evidence.  The Court disagrees.

Although the Defense has not raised the issue, we find that Apprendi v. New Jersey[32] and United States v. Cotton[33] preclude this court from sentencing defendants pursuant to a higher statutory sentencing range then that authorized by the indictment.  While it is true that, as a general matter, courts "do not reach for constitutional questions not raised by the parties,"[34] the magnitude of the liberty interests at stake, and the need "to command the respect and confidence of the community in applications of the criminal law" compel this Court to confront the Apprendi issue in this case.[35]

---

[32] 530 U.S. 466 (2000).

[33] 535 U.S. 625 (2002).

[34] Mazer v. Stein, 347 U.S. 201, 206 n.5 (1954) (collecting cases).

[35] See In re Winship, 397 U.S. 358, 364 (1975).

Under <u>Apprendi</u>, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt."[36]  In federal prosecutions, such facts must also be charged in the indictment.[37]  Since <u>Apprendi</u>, the Third Circuit has repeatedly held that "drug identity and quantity must be treated as elements of a § 841 possession with intent to distribute offense when taking either factor into account increases the applicable statutory maximum."[38]

In <u>Cotton</u>, the Supreme Court affirmed that a sentence enhancement factor deemed an

---

[36] <u>Apprendi</u>, 530 U.S. at 490.

[37] <u>Id.</u> at 476 (quoting <u>Jones v. United States</u>, 526 U.S. 227 (1999)); <u>see also</u> <u>U.S. v. Tidwell</u>, 521 F.3d 236, 243 (3d Cir. 2008) (analyzing <u>Jones</u> to conclude that "allowing . . . dramatic increases in punishment without charging the underlying conduct in an indictment and requiring proof beyond a reasonable doubt raised serious constitutional questions").

[38] <u>United States v. Lacy</u>, 446 F.3d 448, 453 (3d Cir. 2006) ("Thus, we held, in <u>United States v. Barbosa</u>, and <u>United States v. Vazquez</u>, that drug identity and quantity must be treated as elements of a section 841 possession with intent to distribute offense when taking either factor into account increases the applicable statutory maximum.") (internal citation omitted); <u>see also</u> <u>United States v. Grier</u>, 475 F.3d 556, 562 (3d Cir. 2007) ("[T]he facts constituting the elements of a crime are those that increase the maximum punishment to which the defendant is exposed under governing law . . . . <em>Post-Booker</em>, the punishments chosen by Congress in the United States Code determine the statutory maximum for a crime.  The Code identifies the facts necessary to establish an offense and any aggravating circumstances (e.g., significant drug quantity, use of a firearm, injury to a victim) that increase the statutory maximum punishment.  These facts must be established beyond a reasonable doubt."); <u>United States v. Henry</u>, 282 F.3d 242, 245 (3d Cir. 2002); <u>United States v. Vazquez</u>, 271 F.3d 93, 98 (3d Cir. 2001) (en banc) (holding that "an <u>Apprendi</u> violation . . . occurs if the drug <em>quantity</em> is not found by a jury beyond a reasonable doubt and the defendant's sentence under § 841 exceeds [the statutory maximum]) (emphasis added); <u>United States v. Barbosa</u>, 271 F.3d 438, 454 (3d Cir. 2001) (holding that drug <em>identity</em> must be found by a jury beyond a reasonable doubt when the "defendant would be exposed to greater punishment depending upon . . . the identity of the controlled substance.") (emphasis added); <u>United States v. Gray</u>, 558 F. Supp. 2d 589, 596 (W.D. Pa. 2008) ("The <u>Apprendi</u> rule . . . discontinued the court of appeals from affirming sentences that were greater than the otherwise applicable maximum sentence based on drug quantity not charged in the indictment, submitted to the jury, and proved beyond a reasonable doubt.").

element under <u>Apprendi</u> "must . . . be charged in the indictment."[39]  There, a federal grand jury

returned an indictment charging the respondents with conspiring to distribute and to possess with

intent to distribute 5 kilograms or more of cocaine and 50 grams or more of cocaine base, in

violation of 21 U.S.C. §§ 846 and 841(a)(1).  A superseding indictment extended the time period

of the conspiracy and added five more defendants, but did not allege any drug quantity.  After the

jury issued a guilty verdict, the trial court sentenced the defendants.  In so doing, the district court

made a finding of a drug quantity that implicated the enhanced penalties of §841(b)(1)(A), which

prescribes a "term of imprisonment which may not be more than life" for drug offenses involving

at least 50 grams of cocaine base.[40]  The defendants appealed, arguing that the enhanced

sentences violated <u>Apprendi</u> and <u>United States v. Jones</u>.  The Supreme Court agreed, holding that

"[t]he indictment's failure to allege a fact, drug quantity, that increased the statutory maximum

sentence rendered respondents' enhanced sentences erroneous under the reasoning of <u>Apprendi</u>

and <u>Jones</u>."[41]

   Here, the Government argues the appropriate basis for Defendants' sentences is §

841(b)(1)(A), which prescribes a "term of imprisonment which may not be . . . more than life"

for drug offenses involving at least 50 grams of cocaine base."  The indictment returned by the

grand jury, however, charged Defendants with a violation of 21 U.S.C. §§ 841(a) and (b)(1)(B),

---

[39] 535 U.S. at 627; <u>see also</u> <u>United States v. Walls</u>, 215 F. Supp. 2d 159, 162 (D.D.C. 2002) ("In the context of drug cases, this means that when drug quantity causes a defendant's sentence to exceed the statutory maximum, it must be stated in the indictment and proven to a jury beyond a reasonable doubt.").

[40] <u>Id.</u> at 628.

[41] <u>Id.</u> at 632.

and specified knowing and intentional possession of "5 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack")."[42]  The elements of the charged offense are therefore "(1) knowing or intentional (2) possession (3) with intent to distribute (4) *five grams or more* (5) of a mixture or substance containing cocaine base."[43]

The maximum penalty for possession with intent to distribute five grams or more of a mixture or substance that contains cocaine base is *40 years*; the maximum penalty for possession with intent to distribute fifty grams or more of a mixture or substance that contains cocaine base is *life*.  Therefore, the *specific* amount of drugs—fifty grams as opposed to five grams—serves to increase the maximum statutory penalty, and therefore must be treated as an element of the offense.  But the elements of the (uncharged) offense which the Government contends is the proper basis for Defendants' sentences are: (1) knowing or intentional (2) possession (3) with intent to distribute (4) *fifty grams or more* (5) of a mixture or substance containing cocaine base.  Thus, Defendants' indictment does not comply with the requirements established by <u>Cotton</u> and <u>Apprendi</u> because it fails to allege knowing possession of fifty grams or more.

1.    *Waiver of Right to Indictment by Grand Jury*

The otherwise straightforward <u>Apprendi</u> issues posed by this case are complicated by the fact that both Defendants admitted to possession with the intent to distribute drug quantities substantially higher than fifty grams in their plea colloquies.[44]  Fletcher admitted to selling

---

[42] Doc. No. 1 at 2.

[43] <u>Lacy</u>, 446 F.3d at 454 (emphasis added).

[44] It is well-established that a plea allocution acknowledging drug quantity satisfies the proof requirements of <u>Apprendi</u>.  "[A] defendant who, at the plea hearing, agrees that the Government's

13

approximately fourteen grams of crack cocaine every week for the period of May, June and July

of 2008 (a total of 168 grams);[45] Figueroa admitted that Chrin cooked an ounce (28 grams) of

crack for him every week of the same period (a total of 336 grams).[46]  The Court must therefore

---

recitation of the facts (or set of facts) that serves as the basis for the plea accurately and correctly
summarizes the facts of the case against her, admits to those facts (or set of facts)."  See United States v.
Fotiades-Alexander, 331 F. Supp. 2d 350, 352 (E.D. Pa. 2004) (citing Blakely v. Washington, 124 S.Ct.
2531, 2546 (2004); see also U.S. v. Murdock, 398 F.3d 491, 501–02 (6th Cir. 2005) (holding that district
court properly determined amount of loss in a fraud prosecution on the basis of admissions in
Defendant's plea agreement and at his plea colloquy); U.S. v. Santana, 133 F. App'x 828, 830 (3d Cir.
2005) ("Because Santana's sentence was based on facts admitted by him in the plea agreement, his
sentence was not in violation of the Sixth Amendment.") (non-precedential opinion).

[45] The following exchange occurred at Fletcher's change of plea hearing:

| | |
|---|---|
| Government: | Mr. Chrin testified that the defendant, Mr. Fletcher, sold approximately fourteen grams of crack cocaine every week for the period of May, June, and July of 2008.<br>. . . . |
| Court: | Now, Mr. Fletcher, do you agree that the Government has accurately summarized the facts of your case? |
| Defendant: | Yes, m'am. |
| Court: | Do you agree that you committed the acts that [the Government] just recited? |
| Defendant: | Yes, m'am. |

Fletcher Hr'g Tr. 32:1–10.

[46] The following exchange occurred at Figueroa's change of plea hearing:

| | |
|---|---|
| Government: | . . . Mr. Chrin . . . explained how it was that Mr. Chrin sold his drugs on behalf of Mr. Figueroa and on behalf of Hartung, that he would drive them around in his vehicle, that Mr. Figueroa would make drug sales from his vehicle. |
| | In addition, Mr. Chrin would cook the powder cocaine that Mr. Figueroa gave him to cook, and that approximately he cooked an ounce for him every week, which is twenty-eight grams from the period of May 2008 to July 2008 and that Mr. Figueroa would then sell the crack cocaine. |

decide whether those admissions waive the Defendants' right to be indicted by a grand jury as to

an amount of fifty grams or more.  This is a question of first impression in the Third Circuit.

In <u>United States v. Cordoba-Murgas</u>,[47] Judge Cabranes, writing for the Second Circuit,

considered an analogous question and concluded that:

> [W]hen a defendant is indicted for a violation of 21 U.S.C § 841(a) without a
> specified quantity of drugs, the defendant's allocution to a particular quantity
> cannot serve to waive the failure to indict him for the separate crime of violation
> of § 841(a) with a particular quantity of drugs.  Accordingly, the defendant cannot
> be sentenced to a term of imprisonment greater than the statutory maximum set
> forth in § 841(b)(1)(C) for violation of § 841(a).[48]

Judge Cabranes based his ruling on two principles: (1) drug quantity is an element of the crime

defined by 21 U.S.C. § 841(a); and (2) the absence of an indictment is not waived by a guilty

---

. . . .

| | | |
|---|---|---|
| Court: | All right.  So, Mr Figueroa, do you agree the Government has accurately summarized the facts of your case? | |
| Figueroa: | Yes, Your Honor. | |
| Court: | Do you agree that you committed the acts that were just recited to me? | |
| Figueroa: | Yes, Your Honor. | |

Figueroa Change of Plea Hearing Tr. 37:21–39:16.

[47] 422 F.3d 65 (2d Cir. 2005).

[48] <u>Id.</u> at 67.  Notably, the indictment in <u>Cordoba-Murgas</u> failed to specify any quantity of drugs.
Here, the indictment alleged a specific amount.  This distinction does not undermine the persuasiveness
of <u>Cordoba-Murgas</u>'s reasoning.  There, the statutory maximum of twenty years for the charged crime
was based on § 21 U.S.C. § 841(b)(1)(C), the "catch-all" penalty provision of 21 U.S.C. § 841(a).  The
trial court sentenced the defendants under a different penalty provision—§ 841(b)(1)(B)—which
triggered a statutory maximum of forty years.  Here, the statutory maximum (forty years) for the charged
crime is based on § 841(b)(1)(B); the Government requests a sentence based on § 841(b)(1)(A), which
triggers a statutory maximum of life imprisonment.

plea.[49]  Thus, although a valid indictment had been issued by the grand jury, the failure to allege a

drug quantity in that indictment meant that there "was no valid indictment for the crime for

which [the Defendant] was convicted."

Similarly, in United States v. Spinner, the Third Circuit reversed and vacated the

defendant's conviction because of the government's failure to allege an essential element of the

crime in the indictment.[50]  There, though the defendant had entered a guilty plea, he did not

waive his right to indictment by grand jury.  The Third Circuit explained that "[w]hen, as in this

case, an indictment fails to allege all elements of an offense, the defect may be raised by the court

*sua sponte*.  We have held that "failure of an indictment to sufficiently state an offense is a

fundamental defect . . . and it can be raised at any time."[51]

The same problem posed in Cordoba-Murgas is presented here.  As explained above, a

violation of 21 U.S.C. § 841(a) for a specified quantity of five grams or more of crack cocaine

constitutes a different crime than a violation of 21 U.S.C. § 841(a) for a specified quantity of fifty

grams or more, and the applicable statutory penalty varies accordingly.  Sentencing the

Defendants on the basis of the harsher provision will effectively convict them of a crime for

_____

[49] Id.

[50] 180 F.3d 514, 516 (3d Cir. 1999).

[51] United States v. Spinner, 180 F.3d 514, 516 (1999) (holding that a defendant who enters a guilty plea may challenge the sufficiency of the indictment for the first time on appeal); see also United States v. Panarella, 277 F.3d 678, 683 n.2 (3d Cir. 2002).  The Third Circuit has not revisited its ruling in Spinner since Cotton, which held that defects in indictments are not jurisdictional defects.  Cotton, 535 U.S. at 630.  As noted in Panarella, however, Spinner's characterization of an insufficient indictment as a "fundamental" problem did not solely rest on the view that the defect was jurisdictional.  See 277 F.3d at 683 n.2.  Spinner also suggested that the rule that a guilty plea does not preclude an objection that an indictment fails to charge an offense has a constitutional basis, noting that "[t]he inclusion of all elements . . . derives from the Fifth Amendment, which requires that the grand jury have considered and found all elements to be present."  Spinner, 180 F.3d at 515.

16

which they have not been indicted.

Although prosecution by indictment can be waived under Federal Rule of Criminal Procedure 7(b), "the waiver of indictment has been deliberately clothed in formal procedure."[52] Thus, to effect a valid waiver of indictment, the defendant must be advised in open court of the nature of the charge and his rights.[53]  Here, the Defendants have not been given adequate procedural safeguards to notify them of their right to indictment by grand jury, and have not waived their Fifth Amendment right to indictment.

"[T]he court cannot give [a] sentence effect if it is not authorized of law."[54]  Here, a sentence based on 18 U.S.C. § 841(b)(1)(A)—the elements of which are absent from the charging indictment—would violate the principals established in both Cotton and Apprendi. This Court lacks the authority to impose an unconstitutional sentence.[55]  In that regard, this case is distinguishable from Cotton.  There, because the Defendant failed to raise his claim in district court, the Supreme Court applied the plain-error test to determine whether the defective indictment rendered the respondents' sentences erroneous.[56]  Under that test, before an appellate court can correct an error not raised at trial, there must be (1) error (2) that is plain, that (3)

---

[52] United States v. Macklin, 523 F.2d 193, 196 (2d Cir. 1975).

[53] Fed. R. Crim. P. 7(b).

[54] United States v. Greatwalker, 285 F.3d 727, 730 (8th Cir. 2002).

[55] See also 21 Am. Jur. 2d Criminal Law § 764 (2009) ("An illegal sentence is one not authorized or directed by law.  An illegal sentence is one that does not conform to or exceeds statutory limits, is not based on statutory authority, imposes multiple terms of imprisonment for the same offense, fails to conform to the oral pronouncement of sentence, is ambiguous, or otherwise violates the constitution or the law.  Whether a sentence is illegal is determined by interpreting the applicable statute or constitutional provisions.").

[56] Cotton, 535 U.S. at 629.

17

affects substantial rights.  If those conditions are met, the appellate court may correct an error, but *only if* (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.  In Cotton, the Court assumed that the first three elements of plain error test were met, but found that the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings.  Because the evidence of drug quantities in Cotton were "uncontroverted" and "overwhelming," the Court concluded that it was not necessary to vacate the defendant's sentences.

Although we conclude, infra, that the preponderance of evidence shows that the drug quantities in this case were substantially greater than the amount charged in the indictment, the plain-error standard does not control here; having identified a fundamental error in the indictment, the Court is precluded from imposing a plainly illegal sentence.

Our ability to prevent the potential constitutional errors inherent in these Defendants' sentences is complicated by the stage of this criminal prosecution.  Here, the Defendants have already pled guilty to the existing indictment; thus, it is too late for the Government to issue a superseding indictment.  Moreover, Defendants can neither be compelled to waive their indictment rights at this late stage in the litigation, nor can they be forced to withdraw their plea so that the Government may reindict them.  Therefore, we conclude that justice requires Chrin, Fletcher, and Figueroa to be sentenced pursuant to the sentencing range established in 18 U.S.C. § 841(b)(1)(B) for violation of § 841(a) for a specified quantity of five grams or more of crack cocaine.

C.    SENTENCING GUIDELINES

Although we have concluded that the quantities of drugs charged in the indictment

control the appropriate statutory penalties for each defendant, under the sentencing guidelines,

quantities of drugs not included in the offense of conviction must be considered in determining

the base offense level if they are part of the same course of conduct as the count of conviction.[57]

We must, therefore, determine the quantity of drugs attributable to each defendant in order to

determine the applicable guideline sentence.[58]

    *1.*    *Applicable Law*

"In imposing a sentence under the Sentencing Guidelines in a narcotics case, the district

---

[57] See U.S.S.G. § 1B1.3; see also United States v. Doe, 398 F.3d 1254, 1260 (10th Cir. 2005) (quoting United States v. Lara-Velasquez, 919 F.2d 946, 955 (5th Cir. 1990) ("[t]he sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case"); United States v. Paulino, 996 F.2d 1541, 1543 (3d Cir. 1993) ("[F]or the purposes of sentencing, the district court was required to approximate, from trial evidence regarding the level of cocaine activity . . . and corroborating testimony from federal agents at the sentencing hearing, an amount of cocaine which would accurately reflect the extent of the illegal enterprise of the co-conspirators.").

[58] Although following the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), application of the guidelines is not mandatory, district courts must still consult the guidelines in making sentencing determinations.  In United States v. Gunter, 462 F.3d 237 (3d Cir. 2006), the Third Circuit established a three-step process for imposing sentences after Booker:

    (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before Booker;

    (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force;

    (3) Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors, in setting the sentence they impose regardless [of] whether it varies from the sentence calculated under the Guidelines.

Id. at 247 (internal citations, quotation marks, and brackets omitted).

court relies chiefly upon the quantity of drugs involved in the offense."[59]  Although that quantity may include amounts not charged in the indictment or proven at trial, it must be proved by a preponderance of the evidence.[60]  If the exact quantities of drugs in an operation are unknown, the calculation of the amount of drugs involved in a particular operation necessarily entails "a degree of estimation."[61]  The Sentencing Guidelines provide that all information used as a basis for sentencing must have "sufficient indicia of reliability to support its probable accuracy."[62]  This standard "should be applied rigorously."[63]

Under the relevant conduct provision of the Sentencing Guidelines, the Court must consider "all conduct deemed relevant to the offense of conviction in determining the base offense level."[64]  A sentencing court may not, however, "sentence a defendant for the entire amount of drugs in a conspiracy merely because the defendant has been found guilty of the crime of conspiracy."[65]  Instead, members of a drug conspiracy should be sentenced for their "jointly undertaken criminal activity," which is defined as "a criminal plan, scheme, endeavor, or enterprise

---

[59] United States v. Paulino, 996 F.2d 1541, 1545 (3d Cir. 1993).

[60] See United States v. Watts, 519 U.S. 148, 156 (1997) (*per curiam*); see also United States v. Grier, 475 F.3d 556, 568 (3d Cir. 2007) (facts relevant to sentencing must be proved by a preponderance of the evidence).

[61] Paulino, 996 F.2d at 1545; see also U.S.S.G. § 2D1.1 cmt. 12 ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance.").

[62] U.S.S.G. § 6A1.3(a) (1998).

[63] United States v. Miele, 989 F.2d 659, 664 (3d Cir. 1993).

[64] United States v. Collado, 975 F.2d 985, 990–91 (3d Cir. 1992).

[65] U.S.S.G. § 1B1.3.

undertaken by [a] defendant in concert with others, whether or not charged as a conspiracy."[66] Thus, in attributing drug quantities to each defendant, the sentencing court must make an individualized determination of the quantity foreseeable to each defendant within the larger conspiracy.[67]

Under § 1B1.3, there are two methods of attribution:  The court may include "amounts distributed by the defendant himself or herself, but for which he or she was not convicted or charged,"[68] or the "under certain conditions, attribute to the defendant amounts of drugs possessed, distributed, sold or 'handled' by persons other than the defendant."[69]  Accordingly, each defendant's relevant conduct includes "the conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant."[70]  The standard for the latter form of attribution, commonly referred to as "accomplice attribution" is stringent.[71]  In Collado, the Third Circuit held that:

> [A] defendant can be responsible for the quantity of drugs distributed by his or her
> co-conspirator only if the drugs distributed (1) were in furtherance of the jointly-
> undertaken activity, (2) were within the scope of the defendant's agreement, and (3)
> were reasonably foreseeable in connection with the criminal activity the defendant
> agreed to undertake.[72]

---

[66] Id. at § 1B1.3(a)(1)(B).

[67] Collado, 975 F.2d at 992.

[68] Id. at 991 n.5.

[69] Miele, 989 F.2d at 666; United States v. Iglesias, 535 F.3d 150, 160 (3d. Cir 2008).

[70] United States v. Gibbs, 190 F.3d 188, 214 (3d Cir. 1999) (quotations omitted);  see also Collado, 975 F.2d at 990–91; see U.S.S.G. § 1B1.3(a)(1)(B) (relevant conduct).

[71] Miele, 989 F.2d at 666.

[72] United States v. Price, 13 F.3d 711, 731 (3d Cir. 1994) (citing Collado, 975 F.2d at 995).

"In short, a sentencing court must conduct individualized and searching inquiries into each defendant's participation to ensure the sentence accurately reflects each defendant's role and the amount of drugs involved in the conspiracy that was reasonably foreseeable to each defendant."[73]

In the context of the Sentencing Guidelines, "[c]ourts may estimate drug quantity using a variety of evidentiary sources, including testimony of codefendants about the amount of drugs the defendant transported and the average amounts sold per day multiplied by the length of time sold."[74]  To determine the appropriate sentencing guideline range for each defendant involved in the conspiracy, the court must calculate:  (1) the quantity of drugs attributed to each Defendant in the conspiracy; (2) each Defendant's length of time in the conspiracy;[75] and (3) each Defendant's role and culpability in the conduct.[76][77]

---

[73] United States v Turnquest, 724 F. Supp. 2d 531, 536 (E.D. Pa. 2010).

[74] United States v. Surine, 375 F. App'x 164, 169 (3d Cir. 2010) (non-precedential opinion) (citing Gibbs, 190 F.3d at 204).  The Third Circuit considered this issue in Paulino.  There, the government had proposed a drug quantity of 225 kilograms by extrapolating for a period of over two years from the testimony of a sole witness regarding sales made on a single evening.  The district court reduced the government's estimate to a range of 127 to 140 kilograms "to take into account the days in which sales were not that high or days in which no sales were made."  The Third Circuit affirmed the trial court's calculation, rejecting the defendant's arguments that the range should have been even lower and holding that the district court's findings were not clearly erroneous.  See Paulino, 996 F.2d at 1543.

[75] Although some courts include drugs sold prior to the time a defendant joined a conspiracy, this type of attribution is not relevant here.  Citing Seventh and Eighth Circuit case law, the Government argues that "there is a broader and different standard for the drugs attributable to a defendant in a drug conspiracy from drugs attributable to a defendant as "relevant conduct" for the calculation of the offense level under the Sentencing guidelines.  The court need neither consider nor adopt this argument; the Government is not attempting to attribute quantities of drugs to Fletcher or Figueroa that were sold before either defendant joined the conspiracy.

[76] Turnquest, 724 F. Supp. at 534 (determining the length of time (by week) that each Defendant was involved in the conspiracy, the amount of crack sold per week by the drug organization, and multiplying the length of time that each Defendant was involved in the conspiracy by the amount of drugs distributed by Defendant in the conspiracy, taking accomplice attribution into consideration).

[77] Gibbs, 190 F.3d at 203.

2.    *The Crack-Distribution Conspiracy*

In order to understand the full scope of the instant conspiracy, and to conduct the

necessary "individualized and searching inquiry" into each defendant's participation, we turn

now to the evidence against each defendant.  That evidence consists of testimony and evidence

produced at the trial and at the April 8, 2011 fact-finding hearing centering upon the operation

and routines of the Defendants' crack-distribution drug conspiracy, and the Defendants' plea-

colloquy admissions.[78]  As we found Chrin to be credible, and because the defense did not offer

any evidence to controvert his testimony, the following recitation of facts—which the Court finds

to be established by the preponderance of the evidence—is based primarily upon that testimony.

Chrin's testimony gave insight into the operation of the crack-distribution conspiracy

from May 2008 to July 2008.  During that time, Chrin worked closely with Fletcher, Hartung,

and Figueroa to produce and sell crack.  Hartung and Figueroa would acquire powder cocaine,

cook it into crack, and sell it to customers.[79]  Fletcher and Chrin were both dealers—they were

responsible for connecting customers to Hartung and Fletcher, selling to their own customers,

and facilitating drug deliveries.  Chrin had the added responsibility of "cooking" crack for

---

[78] This Court has extensively summarized the events leading to Defendants' indictment in two prior Findings of Fact and Conclusions of Law.  See Mot. to Suppress Evidence: Findings of Fact and Conclusions of Law [Doc. No. 160] ("Fletcher Findings of Fact") (denying Defendant Fletcher's Motion to Suppress and summarizing Chrin, Fletcher and Figueroa's July 30, 2008 arrest); Mot. to Suppress Evidence: Findings of Fact and Conclusions of Law [Doc. No. 170] ("Figueroa Findings of Fact") (order denying Defendant Figueroa's Motion to suppress and summarizing Chrin and Figueroa's June 29, 2008 arrest).  The Court now incorporates those findings into this opinion, as if set forth herein.

[79] Trial Tr. 37:15–19; 44:25–45:4.

Figueroa;[80] Hartung, on the other hand, cooked his own crack.[81]

Each individual involved in the conspiracy had their own customers, however, there was substantial overlap between both customers and suppliers.  Hartung and Figueroa had some of the same customers,[82] and Fletcher and Chrin sold crack supplied from either Hartung and Figueroa to their individual customers.[83]  For instance, when Chrin's customers contacted him seeking crack or cocaine, Chrin would procure the drugs from Hartung or Figueroa based on "who would answer their phone."[84]

For the most part, Figueroa and Hartung had their own source for powder cocaine.  Chrin, however, assisted both men by purchasing cocaine for them when their supplies dwindled by making purchases from a common supplier named "Brian."[85]  On those occasions, Figueroa bought his supply from Brian because he could not get it from his usual source.  On three to four occasions between May and July, Figueroa and Hartung received a discount from Brian by pooling their money to make a larger-than-usual purchase.[86]

Chrin was at Hartung's apartment every day during the period May through July.[87]

---

[80] Trial Tr. 45:10–13.

[81] Trial Tr. 40: 20–23.

[82] Trial Tr. 63: 4–13.

[83] Trial Tr. 52: 13–15.

[84] Trial Tr. 43:3–6; 50: 4–5; 63: 9–13.

[85] Trial Tr. 57:10–59:5.

[86] Trial Tr. 60:5–25.

[87] Trial Tr. at 38:15–16.

During that time, he observed that Hartung would acquire cocaine, cook it into crack, and package it using scales and baggies.[88]  Chrin testified that Hartung would usually cook fifty to seventy grams a week.[89]  Chrin sold Hartung's crack to Hartung's customers and his own customers.[90]  A typical transaction was initiated in one of two ways.  If the buyers were Chrin's customers, they would call and ask for a "gram or two."[91]  Chrin would contact Hartung to see if any crack was available; if so, he would go pick it up, drop it off, and return the money to Hartung.[92]  Other times, Hartung's customers would contact Hartung for drugs, and Chrin would deliver the drugs to the customers either on foot or by driving a vehicle.[93]

Chrin sold drugs to his own customers one to ten times a day; most of those sales were for crack cocaine.[94]  The average weight of crack sales to his customers was one gram.[95]  Chrin sold or delivered to Hartung's customers once or twice a day.  Those sales varied between twenty to a hundred dollars worth of crack cocaine.[96]  Hartung typically paid Chrin with crack, although when Chrin retrieved fifty to a hundred grams of cocaine, he would be paid in cash.[97]

---

[88] Trial Tr. 41:20–25.

[89] Trial Tr. 41:3–4.

[90] Trial Tr. 35:25–36; 37:25–38:10.

[91] Trial Tr. 37:20–21.

[92] Trial Tr. 37:20–24.

[93] Trial Tr. 37:8–9.

[94] Trial Tr. 39:15–16.

[95] Trial Tr. 39:2.

[96] Trial Tr. 39:10–11.

[97] Trial Tr. 40:3–6, 14.

Chrin started cooking crack for Figueroa in "mid to later April" after meeting him through a mutual acquaintance.[98]  From May to July, Chrin cooked 28 grams of cocaine into crack for Figueroa every five to seven days.[99]  Most of the time, Chrin would cook the cocaine for Figueroa at a house on Hall Street, but on at least six occasions, he cooked Figueroa's cocaine into crack at Hartung's apartment.[100]  After cooking the crack, Chrin often drove Figueroa around to deliver the crack.[101]  Chrin also sold cocaine and crack obtained from Figueroa to his own customers, typically obtaining one to three grams from Figueroa every other day.[102]

During the period between May and August, Chrin saw Fletcher every day.[103]  Like Chrin, Fletcher purchased drugs from Hartung and Figueroa (based on who answered their phone first) to sell to his own customers.[104]  Chrin would drive Fletcher around to make his deliveries.[105]  From May to July, Fletcher sold approximately seven grams of crack and two to four grams of cocaine per week.[106]

The events of July 30th (which are charged as overt acts in the indictment) exemplify the typical operation of the conspiracy.  On that date, Chrin, Fletcher and Figueroa drove together to

---

[98] Trial Tr. 41:22–25; 42:1–4.

[99] Trial Tr. 47:11–15.

[100] Trial Tr. 65:4–7.

[101] Trial Tr. 48:21–25.

[102] Trial Tr. 42:23–25.

[103] Trial Tr. 51:9–13.

[104] Trial Tr. 52:12–22.

[105] Trial Tr. 52:7.

[106] Trial Tr. 53:16–22.

pick up money owed to Hartung.[107]  After picking up the money, Chrin drove Figueroa to make deliveries to some of his customers.[108]  When they ran out of product to sell, they went to Hartung's apartment.  Although Hartung was not home, Fletcher had a key to the apartment so that he could access it in Hartung's absence.[109]

At Hartung's, Chrin cooked some of Hartung's powder cocaine into two grams of crack for Figueroa, who had run out, and then packaged the crack using Hartung's packaging materials.[110]  While Chrin cooked the cocaine, Fletcher made deliveries to two customers who had called Chrin and asked for crack.[111]  The crack that Fletcher delivered to those customers was Hartung's.[112]  Chrin left a note for Hartung letting him know that Chrin had used Hartung's cocaine; later, the note was discovered in the course of the warrant search of the apartment.

### 3.    *Application of the Standard to this Case*

Because the length of time of this conspiracy—from May 2008 to July 2008—is not disputed, the Court finds that Figueroa, Fletcher, and Chrin[113] were involved in the conspiracy for a period of 12 weeks.

---

[107] Trial Tr. 79:4–9.

[108] Trial Tr. 79: 4–22.

[109] Trial Tr. 80:5–16.

[110] Trial Tr. 82:17–23; 83:7–12.

[111] Trial Tr. 81:1–14.

[112] Trial Tr. 82:5.

[113] Because Chrin pled guilty pursuant to a plea agreement that stipulated a drug quantity of five to twenty grams, the Court need not analyze the quantity of drugs attributable to him.  Chrin's testimony clearly demonstrates, however, that he played a major role in this conspiracy; if Chrin had pled without the benefit of the plea agreement, the entire amount of drugs would also be attributable to him.

27

The Court must next determine the amount of drugs attributable to Figueroa and Fletcher. The Government's calculation—936 grams of crack cocaine and 134 grams of powder cocaine (the amount attributable to the conspiracy as a whole)—implicates both direct attribution and accomplice attribution because it includes: 1) amounts distributed by Figueroa and Fletcher for which they were not convicted or charged; and 2) amounts of drugs possessed, distributed, manufactured, sold, or otherwise "handled" by Hartung. The Government's crack calculation includes:

1.     The amount of crack cocaine Chrin sold for Figueroa between May and July (28 grams per week x 12 weeks) (336 grams);[114] and,

2.     The amount of crack cocaine Chrin sold for Hartung between May and July (50 grams per week x 12 weeks ) (600 grams) (336 grams + 600 grams = 936 grams).

This calculation attributes to each Defendant sales made by other Defendants. After weighing the evidence, the Court finds accomplice attribution is justified. As previously stated, the Defendants have offered no evidence to controvert Chrin's testimony. That testimony reveals that the Defendants were aware of each others' transactions with Hartung and Fletcher, and that they assisted each other in those transactions. For instance, Hartung and Fletcher pooled their money to receive a discount on cocaine, Chrin frequently made deliveries for Hartung and drove Fletcher to make his deliveries, and Fletcher was present for, and participated in the transactions for every day of the alleged conspiracy. This evidence demonstrates that each Defendant's transactions were within the scope of the agreement. Accordingly, the Court holds that it is appropriate to attribute to each defendant amounts involved in transactions conducted by the

---

[114] The Government does not include the 168 grams which Fletcher expressly admitted to in his plea allocution. That choice reflects the Government's conservative approach to calculating the drug quantities in this case, which sought to avoid "double-counting."

other.

Fletcher argues that the total amount of drugs attributable to him is 84 grams of crack and between 24 to 48 grams of powder cocaine.[115]  This calculation is drawn from the most recent PSIR, which notes that "Chrin knew that from May through July 2008, Fletcher sold approximately seven grams of crack and two to four grams of cocaine per week."  As noted above, however, Fletcher admitted to possessing at least 168 grams of crack over the course of the conspiracy in his plea allocution.  Moreover, we reject Fletcher's argument that he was a minor participant in this conspiracy.  He sold drugs for both Hartung and Figueroa, and was present every day from May to July.  Given his active role and daily participation in this conspiracy, the preponderance of the evidence shows that the entire amount of drugs was reasonably foreseeable to Fletcher as within the scope of the criminal activity that he jointly undertook.

For these reasons, the Court finds the Government's method of calculating the crack quantities for purposes of establishing the applicable Guideline sentencing range to be conservative, reasonable, and appropriate under the facts of this case.  The use of the average quantities of individual transactions multiplied by known numbers of transactions over a period of time is appropriate.  Thus, for the purposes of calculating defendant's Guideline sentences, the base offense level will be determined based on a quantity of 936 grams of crack and 134 grams of cocaine.

## III.  CONCLUSION

After consideration of the Parties' pleadings and arguments, and an "individualized and

---

[115] Letter Brief, March 14, 2011 [Doc. No. 259].

searching inquiry" as to each Defendant's participation in the conspiracy to determine the appropriate sentencing ranges for each defendant, the Court will impose its sentence for each defendant on the basis of the findings contained herein.  The Court shall reserve its ruling on the applicability of the FSA until the time of sentencing.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| vs. | : | **CRIMINAL NOS: 08-000745-01** |
| | : | **08-000745-02** |
| **JOSE IVAN FIGUEROA** | : | **08-000745-03** |
| a/k/a "King Vega"; | : | |
| | : | |
| **THOMAS STACY CHRIN; and** | : | |
| | : | |
| **ADAMMYCHAL S. FLETCHER,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## <u>ORDER</u>

**AND NOW**, this 14th day of July 2011, it is hereby **ORDERED**, for the reasons stated in the accompanying memorandum that:

    (1)    Defendants' statutory sentences will be controlled by the quantity of drugs charged in the indictment; and,

    (2)    For the purposes of the Sentencing Guidelines, the entire quantity of drugs distributed by the conspiracy (936) grams, will determine each Defendants' base offense level; and,

    (3)    The Court will reserve its ruling on the applicability of the Fair Sentencing Act until the date of sentencing.

**IT IS SO ORDERED.**

                                          **BY THE COURT:**

                                      _____

                                      **HON. CYNTHIA M. RUFE**